UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.  CASE NO.: 2:24-cr-42-SPC-NPM

TYLER D. WILLIAMS

## ORDER

Before the Court is Defendant Tyler D. Williams' Renewed Motion for Judgment of Acquittal or Alternatively for a New Trial. (Doc. 106). The Government responded in opposition. (Doc. 112). For the reasons below, the Court denies the motion.

Rule 29 provides that "[a]fter the government closes its evidence . . . the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). But the Court "may reserve decision on the motion, proceed with the trial[,] submit the case to the jury, and decide the motion . . . after it returns a verdict of guilty[.]" Fed. R. Crim. P. 29(b). If the Court takes this approach, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id*. And if the evidence was insufficient, then the Court "set[s] aside the verdict and enter[s] an acquittal." Fed. R. Crim. P. 29(c)(2).

Insufficient evidence means that no "reasonable fact-finder could have determined that the evidence proved the defendant's guilt beyond a reasonable doubt." *United States v. Smith*, 459 F.3d 1276, 1286 (11th Cir. 2006). In making this finding, the Court "review[s] the evidence in the light most favorable to the government and draw[s] all reasonable factual inferences in favor of the jury's verdict." *Id*. So "[t]he prosecution need not rebut all reasonable hypotheses other than guilt." *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005). And "[t]he jury is free to choose between or among the conclusions to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury." *Id*.

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Under this rule, the Court may weigh the evidence and consider the credibility of the witnesses. But to grant such a motion, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004).

This prosecution concerned the conduct of a former Hendry County Sheriff's Deputy. (Doc. 3). In Count One, the Government charged Defendant with deprivation of rights under color of law under 18 U.S.C. § 242—that Defendant threw M.R. to the ground in violation of the Fourth Amendment. At trial, the Government had to prove that Defendant acted under color of state law, deprived M.R. of the right to be free from unreasonable seizure, willfully exceeded and misused or abused his authority, and caused M.R. to suffer a bodily injury as a result.

In Count Two, the Government charged Defendant with falsification of records in a federal investigation under 18 U.S.C. § 1519—that Defendant falsely claimed in his incident report that he (1) took M.R. to the ground because he feared M.R. had a weapon and (2) immediately placed M.R. in the recovery position and summoned EMS personnel. At trial, the Government had to prove that Defendant falsified or made a false entry in a document, did so knowingly, and acted with the intent to impede, obstruct, or influence the investigation of a matter within the jurisdiction of an agency of the United States.

During the trial, the Government called officers from the Hendry County Sheriff's Office, including Sergeant Randy Bone, who was on the scene. The Government presented body camera footage showing the events before, during,

and after the takedown. The Government called Robert Martin to review the takedown and speak to police training. The Government also presented Defendant's incident report and called FBI Special Agent Jordan Brown to confirm an investigation by a United States agency. After a four-day trial, the jury returned its verdict finding Defendant guilty of both counts.

As to Count One, Defendant argues (1) "that his conviction . . . was inconsistent with *Graham v. Connor* . . . and that no reasonable jury could have found him guilty beyond a reasonable doubt" and (2) Martin "based his testimony on a standard inconsistent with *Graham*." (Doc. 106 at 4).

One of the elements of Count One is that Defendant deprived M.R. of the right to be free from an unreasonable seizure. *Graham* provides a framework for determining whether a seizure is unreasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Under this framework, reasonableness turns on the totality of the circumstances in each case. *Id*. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

As the Court has already held, there was sufficient evidence to prove each element of Count One, including that Defendant deprived M.R. of the right to be free from an unreasonable seizure. (Doc. 105 at 3). Regarding excessive force and *Graham*, there was evidence about the severity of M.R.'s

crime—evidence that he had struck a woman earlier in the day, had attempted to break open her window, and hit her window with a stick. (*See, e.g.*, Joint Exhibit 3). The jury watched body camera footage showing M.R. hitting the window with the stick. (Joint Exhibit 1 at 05:00). Although M.R. ran when first confronted, the Government presented evidence that he stopped when ordered and complied with Defendant's other commands. (*Id.* at 103–04, 110). And Martin described M.R. as "compliant." (Doc. 108 at 71). Viewing the moment before the takedown, Martin described M.R. as only "changing[ing] his posture and turning his head to the right," which was at most "passively" resisting. (*Id.* at 110). He also testified that M.R. was not "blading," that is, turning to conceal his left side. (Doc. 107 at 49). The jurors were presented with evidence that Defendant had control of M.R., Defendant had backup, M.R. was handcuffed behind his back, and M.R. was smaller than Defendant. (Doc. 108 at 73–77). The jurors had the body camera footage and could judge the actions and demeanor of M.R. and Defendant during the entire encounter.

Defendant asserts that one of the Government's witnesses, Martin, did not conduct a proper *Graham* analysis. But Martin explicitly acknowledged *Graham*. (Doc. 108 at 68). And he testified that he considered each factor described in *Graham*. (*Id.* at 81) (testifying that he considered the severity of the crime, whether M.R. posed an immediate threat, and whether M.R. was actively resisting arrest or attempting to evade). Defendant seizes on the fact

5

that, when asked about the severity of the crime, Martin responded that he "didn't know at that time when [he] first looked at it" and "[a]fter watching the video and other situations, [he] really didn't know what it was." (*Id.* at 81–82). According to Defendant, this statement renders Martin's testimony at odds with *Graham*.

But this argument ignores the fact that Martin "thought it would be a domestic violence arrest" when he first viewed the body camera footage and, from the beginning, believed the underlying crime was a serious offense. (*Id.* at 81–82, 98). So even after learning the details of the severity of the crime, Martin's opinion did not change—he always believed that the severity of the crime weighed in favor of treating M.R. as a threat, at least before he was under control and handcuffed. (*Id.*). Nonetheless, after watching the body camera footage and considering the totality of the circumstances, Martin believed that Defendant's force was excessive. (*Id.* at 82). This testimony tracked with *Graham*.

Defendant also objects to Martin's testimony on police training. According to Defendant, Martin's testimony that officers are trained "to use the minimum amount of force it takes to obtain our objective" does not state the proper Fourth Amendment standard. (*Id.* at 81). This is true. It's also inconsequential. As the Court properly instructed the jury, evidence of police policies, procedures, and training was "admitted for a limited purpose." (Doc.

104 at 13). The jury was instructed to use this evidence "only to determine whether the Defendant acted willfully[.]" (*Id.*). The Court elaborated:

> It is, of course, wholly up to you to determine whether the Defendant violated any rule or policy or whether he acted in a manner contrary to his training. I caution you that, even if you find that the Defendant violated any rules or policies or that he acted against his training, not every instance of inappropriate behavior on the part of a law enforcement officer rises to the level of a federal constitutional violation. It is possible for a law enforcement officer to violate departmental rules or policies or to violate training principles without violating the United States Constitution, just as it is possible for an officer to violate the Constitution without violating a specific state law or agency policy.
>
> If you determine that the Defendant violated any internal departmental rule or policy or if you find that he acted contrary to his training, you should consider that evidence only in determining whether that Defendant acted willfully, and not in determining whether the Defendant's actions violated the Constitution in the first instance.

(*Id.* at 13–14). So Martin's testimony was relevant to willfulness, and the Court's instructions—instructions Defendant and the Government jointly proposed—made clear that training standards do not inform the Fourth Amendment reasonableness standard. *See United States v. Grushko*, 50 F.4th 1, 15 (11th Cir. 2022) ("The jury is presumed to have followed those instructions.") (citation omitted).

Consequently, Defendant's other argument that there "was no evidence that he acted willfully" falls flat. (Doc. 106 at 13). Martin testified that he trained Defendant. (Doc. 108 at 94). While watching the body camera footage,

7

he pointed out several points in which the Defendant acted inconsistently with police training. (*Id.* at 72, 75, 78–79, 81, 82). And he testified that Defendant's takedown was not a matter of poor technique and that he would not teach an officer to perform a takedown that way. (*Id.* at 82, 120). Defendant's own words captured on the body camera footage evidence that he acted willfully. Before the takedown, he warned, "if you push up against me again, I am going to throw your ass back on this asphalt." (Joint Exhibit 2 at 00:34). Then, after the takedown, he stood over M.R. and yelled "what did I tell you about pushing up against me, do you understand me." (*Id.* at 01:07).

As to Count Two, Defendant argues that no reasonable juror could have concluded that Defendant's incident report was false. The indictment charges that Defendant falsely stated: (1) "In fear that [M.R.] may be in possession of a weapon on his left side, Deputy Williams grabbed [M.R.'s] shoulders, turned and took [M.R.] to the ground in order to minimize [M.R.'s] movements in case a weapon was on his persons" and (2) "Deputy Williams immediately placed [M.R.] in the recovery position and summoned EMS personnel to the scene to medically evaluate [M.R.]." (Doc. 3 at 2). Defendant argues that no reasonable jury could find that either statement was false.

For the first statement about Defendant's fear of a weapon, Defendant argues no reasonable jury could find this statement was false because the issue turns on his subjective belief. To show that he truly feared M.R. may have had

8

a weapon, Defendant emphasizes that he may not have searched M.R.'s left side (Doc. 106 at 16). His argument fails for two reasons.

For one, even if Defendant feared M.R. may have possessed a weapon, the jury still could have concluded that his statement was false. That's because there was sufficient evidence to conclude that Defendant's motivation for taking M.R. to the ground had nothing to do with his fear of a weapon, honestly held or not. The body camera footage shows Defendant warning M.R. that he would throw him on the asphalt if he pushed against him again, then yelling "what did I tell you about pushing up against me" when M.R. was unconscious on the ground. (Joint Exhibit 2 at 01:07). Defendant remarked "simple instructions" over M.R. as he lay on the ground. (Joint Exhibit 1 at 10:38). He also offered another explanation to Sgt. Bone, stating that M.R. kicked him in the shin. (*Id*. at 06:27). And as EMS were on the scene, he told M.R. "when I tell you to lean against my car, don't push back on me, okay, you will be taken to the ground." (*Id*. at 11:17). Defendant's own contemporaneous statements provide sufficient evidence for a reasonable jury to conclude that he falsely stated his motivation for taking M.R. to the ground was his fear of a weapon.

Moreover, the Government also presented evidence that the Defendant, in fact, was not fearful of a weapon. Sgt. Bone testified that he had responded to calls with Defendant before and had seen him in fear of a weapon. Yet, Sgt. Bone stated that Defendant did not appear to be in fear of a weapon when he

9

took M.R. to the ground. (Doc. 107 at 53–54). Martin similarly testified that if Defendant was fearful of a weapon, then he would have looked at and reached for M.R.'s hands, rather than looking elsewhere and grabbing M.R.'s shoulders. (Doc. 108 at 78–79). He testified that M.R.'s body and hand positioning did not indicate he had a weapon or posed any threat. (*Id*. at 108). And even once M.R. was on the ground, Defendant did not search him for a weapon. (*Id*. at 79–80).

For the second statement, Defendant argues that the term "immediately" is ambiguous and that the jury should not have been permitted to guess what Defendant meant when he stated that he immediately placed M.R. in the recovery position and summoned EMS. (Doc. 106 at 20). He does not offer competing definitions of "immediately" to show that it is ambiguous. And definitions of "immediately," along with the facts here, demonstrate that there was sufficient evidence for a reasonable jury to determine that Defendant's statement was unambiguously false.

The Oxford English Dictionary defines "immediately" as "without any delay or lapse of time; instantly, directly, straightway; at once. *Immediately*, *Oxford English Dictionary* (2nd ed. 1989). Merriam-Webster Dictionary defines "immediately" as "without interval of time." *Immediately*, *Merriam-Webster.com Dictionary* (2025). Similarly, Black's Law Dictionary defines "immediately" as "without delay; instantly, directly, or straightaway," while

acknowledging that in temporal terms, the meaning of "immediately" can vary according to the context. *Immediately*, *Black's Law Dictionary* (12th ed. 2024).

Defendant did not immediately place M.R. in the recovery position, that is, without any delay or lapse of time. Rather, after throwing M.R. to the ground, Defendant first stood over M.R. and yelled at him for pushing up against Defendant. He then walked to the back of his police car, in the opposite direction of M.R., who was lying unconscious on the ground. He radioed that M.R. was unconscious and picked his wallet up off the back of his police car, flipped it open, then placed it back. As he did this, Sgt. Bone began to help M.R. Defendant then walked back over to Sgt. Bone and M.R. and placed him in the recovery position. About forty seconds passed between the time Defendant threw M.R. to the ground to when he placed M.R. in the recovery position. (Joint Exhibit 1 at 09:09-09:48; Joint Exhibit 2 at 01:06–01:45). As Sgt. Bone testified, forty seconds is a long time when someone is having a medical emergency. (Doc. 107 at 51). He also testified, as someone who was on the scene in the heat of the moment, that he did not believe Defendant immediately placed M.R. in the recovery position. (*Id*. at 41, 51). Although at other times his testimony was admittedly weak on this point. (Doc. 108 at 24–26). A reasonable jury—considering the testimony, body camera footage, and incident report—had sufficient evidence to determine that Defendant falsely stated that he immediately placed M.R. in the recovery position.

Defendant also argues that whether Defendant immediately placed M.R. in the recovery position is immaterial because EMS was contacted and he was placed in the recovery position all within forty seconds. He does not develop this argument. (*See* Doc. 106 at 21) (devoting only two sentences and no authority to the argument). As the court instructed the jury, a material matter is "an important fact—not some unimportant or trivial detail—that has the natural tendency or is capable of influencing a decision of a department or agency in reaching a required decision." (Doc. 104 at 15). The jury heard evidence that forty seconds was a long time in the context of a medical emergency—not an unimportant or trivial delay. And the slant of Defendant's statement had the natural tendency to influence an investigation into Defendant's misconduct.

Finally, Defendant argues that no reasonable jury could find that Defendant wrote these false statements with the intent to impede an investigation. (Doc. 106 at 20). Afterall, Defendant's immediate supervisor Sgt. Bone witnessed the incident and Defendant knew the body camera footage would be reviewable by superiors. (*Id.*). "Any intentional false statement would be pointless," so the argument goes.[1]

---

[1] Defendant also argues, for preservation purposes, that the Government must show an intent to impede a *federal* investigation. This argument is foreclosed by Eleventh Circuit precedent. *See United States v. McQueen*, 727 F.3d 1144, 1152 (11th Cir. 2013).

But the Government had to prove only that Defendant intended to impede an investigation, not that he succeeded or even that his intent was well thought out. So whether his false statements were "pointless" is irrelevant. And the Government presented sufficient evidence to prove that Defendant had the requisite intent to impede. Sgt. Bone testified, and the body camera footage showed, that he stated to Defendant, "I'm sure more is going to come with this one." (Joint Exhibit 1 at 14:18). This meant that Defendant could get a "write up" for his conduct, since a supervisor above Sgt. Bone would review the body camera footage. (Doc. 107 at 43). Sgt. Bone testified that he reminded Defendant to place his body camera into the docking station so the video could be uploaded. (*Id.* at 44). And he testified that officers learn during training that uses of force "could be investigated for potential violations of state and federal law." (*Id.* at 34). Defendant knew about this information, including Sgt. Bone's comment about a potential write-up, before he wrote his incident report, in which he tries to support and minimize his use of force. (*Id.* at 43).

As outlined above, under Rule 29 there was sufficient evidence for a reasonable jury to find Defendant guilty beyond a reasonable doubt on both counts. And, even under the Rule 33 standard, the Court does not find that the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.

Accordingly, it is now

**ORDERED:**

Defendant's Renewed Motion for Judgment of Acquittal or Alternatively for a New Trial (Doc. 106) is **DENIED.**

**DONE AND ORDERED** in Fort Myers, Florida on April 18, 2025.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of Record